IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MVB BANK, INC.,              )
    Plaintiff,              )
                            )   Case No. 1:15-cv-308
     v.                       )
                            )
STIFEL BANK & TRUST,         )
    Defendant.              )
                            )

## MEMORANDUM OPINION

In this breach-of-contract dispute arising from the sale of a commercial loan portfolio, plaintiff alleges that contrary to contractual representations, defendant misrepresented that two loans included in the loan portfolio were cross-collateralized and failed to comply with its own policies and procedures when assessing the loans that were sold. On the basis of these alleged breaches of contract, plaintiff seeks to enforce a provision in the Loan Sale Agreement ("LSA") that requires defendant to repurchase the loans in the event of a material breach. Following full discovery, the parties filed cross-motions for summary judgment. As the motions have been fully briefed and argued, they are now ripe for disposition.

I.

The undisputed material facts are as follows:[1]

- Plaintiff MVB Bank, Inc. is a commercial bank with its headquarters in Fairmont, West Virginia.

- Defendant Stifel Bank & Trust is a commercial bank with its headquarters in St. Louis, Missouri.

---

[1] The undisputed material facts are derived from the parties' lists of undisputed facts and the summary judgment record as a whole, including depositions, declarations, and various documents.

1

- On October 31, 2013, defendant acquired by merger Acacia Federal Savings Bank ("Acacia"), which operated a single branch office located in Falls Church, Virginia. At the time of acquisition, Acacia had a commercial loan portfolio of approximately 20 performing loans with above-average risk ratings.

- After acquiring Acacia, plaintiff and defendant began discussions related to the Acacia loan portfolio, and on November 7, 2013, plaintiff signed a Non-Disclosure Agreement with defendant to enable it to perform due diligence on the Acacia loan portfolio.

- Among the 20 loans included in the Acacia loan portfolio were a loan to Northpointe Development Corporation ("Northpointe") in the original principal amount of $5,300,000.00 ("Northpointe Loan") and a loan to Town Center Development LLC ("Town Center") in the original principal amount of $6,725,000.00 ("Town Center Loan").

- The Northpointe Loan is secured by a first lien against the Northpointe Property and by an assignment of leases and rents generated by the office building located on the Northpointe Property.[2]

- The Town Center Loan is secured by a first lien against the Town Center Property and by an assignment of leases and rents generated by the office building located on the Town Center Property.[3]

- Permvir Singh, the owner of Northpointe and Town Center, along with his wife, Maneesha Singh, executed two separate Guaranty Agreements, one with respect to the Northpointe Loan and one with respect to the Town Center Loan.

- Singh, owner of 100% of the Northpointe stock, also pledged all of the Northpointe stock as additional collateral for the Town Center Loan ("Northpointe Stock Pledge").

---

[2] The Northpointe Loan is secured by this collateral pursuant to a Revolving Credit Line Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated February 7, 2006, both of which were modified by a Deed of Trust Modification Agreement and Modification of Assignment of Leases and Rents dated April 7, 2011 (collectively, the "Northpointe Deed of Trust").

[3] The Town Center Loan is secured by this collateral pursuant to a Revolving Credit Line Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 30, 2007, which was modified by a Deed of Trust Modification Agreement and Modification of Assignment of Leases and Rents dated August 10, 2009 (collectively, the "Town Center Deed of Trust").

- The Town Center loan was also cross-defaulted with the Northpointe Loan such that the "occurrence of an [e]vent of [d]efault under the Northpointe Loan" constitutes an event of default under the Town Center Loan. Def. Ex. 1, Town Center Loan Agreement, § 5.01(j).

- Defendant made loan documents available to plaintiff, and plaintiff conducted on-site due diligence on November 11-12, 2013.

- Plaintiff's employees examined the loan files, loan documents, and security instruments, including deeds of trusts, assignments of rents, and title opinions. The loan documents gave no indication that any of the loans in the portfolio were cross-collateralized by real restate such that there were reciprocal deeds of trust.

- Although defendant provided a risk assessment for each of the loans, plaintiff performed its own risk assessment of each loan, based on the documents defendant provided. Plaintiff graded the Town Center loan as a "3" based on the knowledge it had at the time, including the knowledge that SERCO, Town Center's largest tenant, was a month-to-month tenant at Town Center.

- On November 22, 2013, Donald Robinson, plaintiff's Chief Credit Officer ("COO"), sent a Letter of Intent ("LOI") to defendant's CEO, Christopher Reichert, in which plaintiff offered to purchase the Acacia commercial loan portfolio for $200,000 and 10% of the unpaid principal balances of the loans. Defendant accepted plaintiff's offer and signed the LOI, which provided that the closing of the sale would occur on or before December 3, 2013.

- Following the execution of the LOI, the parties' attorneys began preparing the legal documents required to consummate the sale, including the LSA and various exhibits to the LSA, such as an exhibit designated as "Schedule 1" that listed the loans being sold and provided pertinent information regarding each loan. Between November 24, and December 1, 2013, various drafts of the LSA and Schedule 1 were exchanged.

- On November 27, 2013, Singh informed Richard Thomas, defendant's Loan Officer responsible for administering the Northpointe Loan and Town Center Loan, that Town Center had lost SERCO as a tenant.

- Thomas then wrote a risk rating memorandum, recommending a downgrade of the Town Center loan from "Pass" to "Watch" in light of SERCO's departure. Def. Ex. 14, Risk Rating Justification Memorandum.[4]

---

[4] Under the Loan Agreement, Town Center was required to maintain a Debt Service Coverage ("DSC") ratio of at least 1.2, meaning that the annual net income generated by the property had to exceed the annual debt service by more than twenty percent. *See* Town Center Loan

- In preparing the risk rating memorandum, Thomas followed Acacia's loan policy rather than defendant's standard loan policy and procedures because defendant had determined that, as a matter of policy, defendant's Loan Officers would follow Acacia's loan policy for all the loans in the loan portfolio, as Acacia had originated the loans under that rating system and the Loan Officers for those loans were former Acacia employees.

- Pursuant to Acacia's policy and procedures, a Loan Officer makes a recommendation under a risk rating form, and that recommendation becomes the formal risk rating only after being signed by the head of the department or chief lending officer.

- Pursuant to defendant's Risk Rating Policy, a Loan Officer is "responsible for assigning the appropriate risk rating to each loan they manage" and the rating "can be approved by the Loan Committee at any time followed by ratification by the Executive Loan Committee." Pl. Ex. 24, Defendant's Risk Rating Policy, at 37.

- It was defendant's practice to consider any proposed rating changes at its regular quarterly loan review meetings.

- Although the Loan Officers followed Acacia's loan policy when making the initial recommendation, those recommendations were translated into defendant's classification system under the Risk Rating Policy and ultimately reviewed according to defendant's policies and practices.

- Defendant did not have a regularly-scheduled quarterly loan review meeting between October 31, 2013, when it bought Acacia, and the December 3, 2013 closing date. Nonetheless, several executives, including Reichert, reviewed Thomas's recommendation and decided not to downgrade the loan at that time.[5]

- On December 2, 2013, one day before closing, Reichert called Don Robinson, plaintiff's President and COO, and told him about the loss of SERCO and that it would negatively affect Town Center's cash flow.

---

Agreement, § 4.25. According to Thomas's calculation, with the loss of SERCO, the DSC ratio for Town Center had been reduced to .99. *See* Risk Rating Justification Memorandum, at 1.

[5] The following executives reviewed Thomas's recommendation: Reichert, defendant's CEO, Arlen Gelbard, defendant's Senior Counsel and President of the Atlantic Region, and Mark Ross, defendant's Senior Vice President of commercial lending.

- As a result of the call between Reichert and Robinson, plaintiff believed prior to closing that defendant had either put the Town Center loan on "Watch" or would do so if it was going to keep the loan rather than sell it to plaintiff.

- Reichert and Robinson also discussed the Northpointe Loan and Town Center Loan. Specifically, Reichert told Robinson that the two loans were cross-collateralized and that defendant would add an affirmative representation to Schedule 1 reflecting the cross-collateralization. Thereafter, Arlen Gelbard, defendant's senior in-house counsel, sent an email to plaintiff's outside counsel that included a revised Schedule 1, which accorded with what Reichert had told Robinson over the phone.[6]

- Thereafter, on December 3, 2013, the parties closed on the Acacia commercial loan portfolio sale in accordance with the terms of the LSA; plaintiff wired defendant $71,416,703.66.

- The LSA includes various representations and warranties by defendant concerning the loans, including representations related to loan status, compliance, and accuracy of schedules. *See* LSA § 4.01.[7]

- The LSA further provides that all of the representations set forth therein "shall survive the Closing for a period of twenty-four (24) months after the Closing Date." *Id.*

- Section 7.08 of the LSA provides that defendant is obligated, upon being notified by plaintiff at any time during the twenty-four month period of any material

---

[6] The revised version of Schedule 1 included a new column titled "Loans Cross Collateralized." Gelbard Email, p. 5. The entry in that column on the line for the Northpointe Loan read "Town Center Dev. LLC," and the entry for the Town Center Loan read "Northpointe Development." *Id.*

[7] Specifically, Section 4.01 of the LSA includes the following representations and warranties:

> (b) Loan Status. None of the Loans (A) are contractually past due sixty (60) days or more in the payment of principal and/or interest, (B) are on nonaccrual status, or (C) are classified as "Watch List," "Substandard," "Doubtful" or "Loss."…

> (e) Compliance. Each Loan has been solicited and originated and is administered and, where applicable, serviced, and the relevant files are being maintained, substantially in accordance with the relevant Loan Documents, Seller's underwriting standards and with all applicable Legal Requirements. …

> (i) Accuracy of Schedules. All information pertaining to each Loan set forth in the schedules attached hereto is true, correct and complete in all material respects.

LSA § 4.01.

breach of any representation or warranty in the LSA, to cure the breach or repurchase the affected loans at a price to be established under a formula set forth in the LSA. LSA § 7.08.[8]

- The LSA defines "Loan Collateral" to include "securities, ... guaranties, ... and all other property, real or personal, tangible or intangible, new or used, securing a Loan." LSA at 4.

- Following the loss of SERCO, Town Center did not have sufficient cash flow to make the required monthly payments on the Town Center Loan and failed to make the payment that was due on January 1, 2014 (the first payment due following the loan sale).

- Thereafter, Northpointe lost several tenants and was unable to make payments on its loan.

- Plaintiff declared both the Northpointe loan and the Town Center loan in default on March 5, 2014.

- On January 14, 2014, Robinson wrote to Reichert demanding that defendant repurchase the Northpointe Loan and Town Center Loan on the ground that, contrary to defendant's representation, Northpointe did not have sufficient cash flow to cover both loans.[9]

---

[8] Specifically, the LSA provides that "[a]fter the Closing and prior to the expiration of the [twenty-four month period], in the event of a material breach by [defendant] of a representation or warranty ... [plaintiff] shall have the right to give [defendant] a Certificate of Defect with respect to the related Loan" and that "[b]y no later than the date that is thirty (30) days following [defendant's] receipt of a Certificate of Defect ... , [defendant] shall notify [plaintiff] in writing that [defendant] either: (A) intends to attempt to cure such Breached Representation within the Cure Period ... , [or] (B) will repurchase the Defective Loan." LSA § 7.08. Section 7.08 further provides that if defendant "has given [plaintiff] notification of [defendant's] intention to attempt to cure a Breached Representation but [defendant] has failed to cure such Breached Representation to [plaintiff's] reasonable satisfaction on or prior to the expiration of the applicable Cure Period ... , then [defendant] shall repurchase the applicable Defective Loan." Id.

[9] The letter stated:

> [a]s the loans are cross collateralized and with the cash flow assignment from Northpointe, the cash flow coverage was disclosed by [defendant] to [plaintiff] to be sufficient to cover both loans; however, due to the loss of [SERCO], the Town Center loan was downgraded to "watch" credit. No change was made to the Northpointe loan. This change on Town Center was disclosed to [plaintiff] at close and it was agreed to keep the loans in the portfolio and there were no issues with the Northpointe loan.

- Thereafter, on January 22, 2014, Reichart responded with a letter in which he rebuffed plaintiff's demand for defendant to repurchase the loans on the ground that there was no material breach because no loans were "substandard ... at the time of closing." Pl. Ex. 22, Reichert Letter.

- Pursuant to LSA § 7.08, plaintiff provided defendant with Certificates of Defect on the basis that defendant breached various representations regarding the Town Center loan and the Northpointe Loan, including the representations on Schedule 1 of the LSA that the Town Center loan and Northpointe loan were "cross-collateralized." Pl. Ex. 21, Certificates of Defect. Plaintiff demanded that defendant cure the defects or repurchases the loans. *Id.*

- Defendant refused plaintiff's demand, and this litigation ensued.

On March 3, 2015, plaintiff filed a complaint alleging that defendant breached the LSA: (i) by misrepresenting that the Town Center Loan and Northpointe Loan were cross-collateralized, and (ii) by failing to comply with defendant's underwriting policies. Thereafter, on October 30, 2015, the parties filed cross-motions for summary judgment. Specifically, defendant moved for summary judgment with respect to both of plaintiff's breach-of-contract claims, and plaintiff moved for summary judgment only with respect to its claim that defendant breached the LSA by misrepresenting that two loans were cross-collateralized. The matter is now ripe for disposition.

## II.

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party

---

Def. Ex. 18, Robinson Letter. The letter further stated that "[w]hile the loss of [SERCO] was disclosed, the loan was only purchased based on the fact that it had a watch credit and the related loan of Northpointe had sufficient cash flow to cover both loans, which in fact it doesn't." *Id.*

seeking summary judgment has the initial burden to show the absence of a material fact. *See id.* at 325. To defeat a motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (quoting Fed. R. Civ. P. 56(e)). In evaluating a motion for summary judgment, a district court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). An issue of material fact is genuine when "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice." *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.

Analysis properly begins by considering whether defendant materially breached the LSA by misrepresenting that the Northpointe Loan and Town Center Loan were cross-collateralized. Plaintiff contends that although Schedule 1 to the LSA states that the Northpointe Loan and Town Center Loan are cross-collateralized, they are in fact not cross-collateralized, and hence defendant has breached § 4.01(i) of the LSA, which provides that "[a]ll information pertaining to each Loan set forth in the schedules attached hereto is true, correct and complete in all material respects." LSA, § 4.01(i), at 14. As a remedy for the alleged breach, plaintiff invokes the LSA buy-back provision, which requires defendant, upon the occurrence of a material breach, to repurchase the Town Center Loan and the Northpointe Loan. *See* LSA § 7.08. The question

presented, therefore, is whether the Town Center Loan and Northpointe Loan are cross-collateralized, as represented in the LSA.

Under Virginia law, a court must interpret an unambiguous contract "as it is written, without adding terms that were not included by the parties." *Amchem Prods., Inc. v. Newport News Circuit Asbestos Cases*, 264 Va. 89, 98 (2002).[10] Put simply, a court should "construe the words as written in the contract, and ... [should] not make a new contract for the parties." *Id.* Here, both parties agree that the term "cross-collateralized" is not ambiguous; when multiple loans are "cross-collateralized," those loans are secured by at least some of the same collateral.[11] The parties also agree that defendant represented the Northpointe Loan and Town Center Loan as being cross-collateralized. *See* LSA, Schedule 1. The disputed issues are whether the Northpointe Loan and Town Center Loan are, in fact, cross-collateralized as represented by defendant in the contract and, if they are not, whether the misrepresentation constitutes a material breach. Each issue is separately addressed.

---

[10] *See also Pocahontas Mining Ltd. Liability Co. v. Jewel Ridge Coal Corp.*, 263 Va. 169, 173 (2002) ("[W]hen the terms of a contract are clear and unambiguous, a court must give them their plain meaning.")

[11] Indeed, courts routinely employ the term "cross-collateralization" when referring to a situation in which the collateral securing one loan also secures another loan. *See e.g., Policeman's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*, 907 F. Supp.2d 536, 549 (S.D. N.Y. 2012) (defining cross-collateralization as "where the property securing one loan group is also used to secure another"); *Bank of Am., N.A. v. Newton*, No. 2:10CV975-CSC, 2012 WL 4466526, at *2 (M.D. Ala. Sept. 25, 2012) ("The cross-collateralization of the properties, in which each property is pledged as collateral for all four loans, has been at the heart of this dispute."); *U.S. Bank v. Nat'l Ass'n v.Grayson Hospitality, Inc.*, No. 4:14CV570, 2014 WL 7272842, at *2 (E.D. Tex. Dec. 22, 2014) ("Each individual loan is ... cross-collateralized with all of the loans, such that ... [p]roperty that secures repayment of a particular loan simultaneously secures repayment of all of the other loans."); *cf. United Paperworkers Int'l Union, AFL-CIO, CLC v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 430 (D. Mass. 1995) ("The two loans were not cross-collateralized: the loan to Alden was secured only by Alden assets and the loan to Bates was secured solely by Bates assets.").

**A.**

In order for the Town Center Loan and Northpointe Loan to be cross-collateralized, a property interest pledged as collateral securing one loan must also be pledged as collateral securing the other loan, as this would allow plaintiff to reach directly the collateral of one loan upon the default of the other loan. Defendant argues that the Town Center Loan and Northpointe Loan are cross-collateralized for two independent reasons: (i) because Mr. and Mrs. Singh personally guaranteed both loans and (ii) because Mr. Singh pledged all of the Northpointe stock as collateral for the Town Center loan. These arguments fail, however, as neither the personal guaranties nor the Northpointe stock secure both the Town Center Loan and the Northpointe Loan.

Defendant first contends that the Town Center Loan and Northpointe Loan are cross-collateralized insofar as the Singhs personally guaranteed each loan and the LSA defines "Loan Collateral" to include guaranties. LSA, at 4. Specifically, the contract defines "Loan Collateral" as "any real property, machinery, equipment, fixtures and furnishings, inventory, cash certificates of deposit, securities, leases, *guaranties*, indemnities, … and all other property, real or personal, tangible or intangible, new or used, *securing a Loan*, in each case, as set forth in the respective Loan Documents." *Id.* (emphasis added). The LSA definition of Loan Collateral clearly states that a guaranty can serve as Loan Collateral, but as plaintiff correctly points out, it does not follow that a guaranties always serve as Loan Collateral pursuant to the LSA; rather, the contractual language makes clear that a guaranty serves as Loan Collateral *only if* the guaranty "secur[es] a loan." *Id.*[12]

---

[12] In this way, the LSA's definition of "Loan Collateral" comports with the ordinary commercial definition of "collateral." *See* Black's Law Dictionary (10th ed. 2014) ("Collateral") (defining

Here, as plaintiff correctly contends, the Singhs' personal guaranties do not secure the Town Center Loan and Northpointe Loan because the Singh's personal guaranties are not property owned by the Singhs and pledged to the lender as security for the loans. Instead, the Singhs' personal guaranties are direct contractual obligations owed by the Singhs to the lender, similar to the obligation that the debtors—Town Center and Northpointe—owe to the lender. Under the terms of the guaranties for both loans, the Singhs are contractually obligated to the pay the loans if Northpointe and Town Center fail to do so. Put differently, in the event of a default by Northpointe or Town Center, the lender, plaintiff, can demand that the Singhs pay the defaulted loan. In making such a demand, plaintiff would not be exercising the rights of a secured creditor to take possession of, and sell, property serving as collateral for the loans, but would be enforcing a direct contractual obligation owed to it by the Singhs under the guaranties themselves.[13] As plaintiff notes, there are instances where a guaranty could secure a loan. For example, a holder of a guaranty from a guarantor could secure a loan if the guaranty was assigned to the lender as collateral for the loan. *See, e.g.*, *Regal Ware, Inc. v. Fid. Corp.*, 550 F.2d 934, 941 n.21 (4th Cir. 1977) (assigning rights to recover under guaranty to secure payment of promissory notes). Such circumstances, however, are not present where, as here, a borrower simply guaranties a loan rather than pledging a property interest in a pre-existing guaranty held

---

collateral as "[p]roperty that is pledged as security against a debt; the property subject to a security interest").

[13] Indeed, because the Singhs' guaranties are unsecured, plaintiff cannot seek satisfaction of the Town Center Loan or Northpointe Loan from any of the Singhs' assets unless and until plaintiff sues the Singhs, obtains a final judgment against them for the sums outstanding on those loans, and executes on that judgment. Such a process could take years, and hence does not provide plaintiff with immediate access to the Singhs' assets as would collateral securing the loans.

by the borrower. Thus, because the Singhs' guaranties do not secure the Northpointe Loan or the Town Center Loan, they do not constitute "Loan Collateral" under the LSA.[14]

Defendant next contends that the Town Center Loan and Northpointe Loan are cross-collateralized because Singh's Northpointe stock served as collateral for the Town Center loan. This argument also fails, though for a reason different from the reason that Singhs' personal guaranties do not cross-collateralize the loans. Unlike the Singhs' guaranties, the Northpointe stock clearly counts as "Loan Collateral" as defined by the LSA because it is a property interest that *secures* the Town Center loan. Importantly, however, the Northpointe stock secures *only* the Town Center Loan—not the Northpointe Loan—and hence does not *cross*-collateralize the Town Center Loan and Northpointe Loan. *See* Def. Ex. 5, Northpointe Stock Pledge. Hence, the definition of cross-collateralization—the same collateral securing multiple loans—is not met by virtue of the Northpointe Stock, which secures only one of the two loans.

In sum, neither the Singhs' personal guaranties nor the Northpointe stock cross-collateralized the Town Center Loan and Northpointe Loan as was represented in Schedule 1. Indeed, the only property interest pledged as collateral securing the Northpointe Loan is the Northpointe Property, and the only property interests pledged as collateral securing the Town Center Loan are the Town Center Property and the Northpointe Stock Pledge. Because no

---

[14] Furthermore, defendant's contention that the Singhs' guaranties "cross-collateralize" the Northpointe Loan and Town Center Loan is at odds with the content of Schedule 1, which lists the guarantors for each loan. *See* LSA, Definition of "Loan Schedule," at 5. Schedule 1 reflects that six of the loans have common guarantors, including the Northpointe Loan and the Town Center Loan. LSA, Schedule 1. Yet, two of the loans listed as having common guarantors—the 250 S. Washington LLC loan and the Church Road Limited loan—are *not* listed as being "cross-collateralized." *Id.* If, as defendant contends, the guaranties executed by common guarantors count as "Loan Collateral," these two loans should have been designated as "cross-collateralized" as required by the LSA. *See* LSA, § 4.01(h). That the 250 S. Washington LLC loan and the Church Road Limited loan were not designated as "cross-collateralized" indicates that defendant did not consider loans to be "cross-collateralized" by virtue of having common guarantors.

property interest pledged for one loan is also pledged for the other loan, the Town Center Loan and Northpointe Loan are not cross-collateralized. Thus, defendant breached the LSA insofar as not "[a]ll information pertaining to each Loan set forth in the schedules attached hereto [was] true, correct and complete in all material respects." LSA, § 4.01(i).

## B.

Although defendant breached LSA § 4.01(i), it does not necessarily follow that plaintiff is entitled to invoke the buy-back remedy set forth in LSA § 7.08, as that remedy is available only "in the event of a *material* breach." LSA § 7.08 (emphasis added). Thus, in order for plaintiff to compel defendant to repurchase the Town Center Loan and Northpointe Loan pursuant to LSA § 7.08, plaintiff must show that the defendant's misrepresentation that the Town Center Loan and Northpointe Loan were cross-collateralized constitutes a material breach.

Under Virginia contract law, "[a] breach is material if it is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Parr v. Alderwoods Grp., Inc.*, 268 Va. 461, 467 (2004) (internal citation and quotations omitted). Importantly, "whether a breach is material is judged at the time of the breach." *See SunTrust Mortg., Inc. v. United Guaranty Residential Corp. of N. Carolina*, No. 3:09cv529, 2014 WL 998188, at *10 (E.D. Va. March 13, 2014) (citing *Farnsworth on Contracts* § 8.16).[15]

Because the present case involves a contract for the sale of a loan portfolio, the scope of the materiality inquiry must be defined. Defendant contends that a material breach exists only if the breach defeats an essential purpose of the *entire LSA*, and plaintiff contends that a material

---

[15] Thus, contrary to defendant's suggestion, any events that occurred after the parties formed a contract, namely the default of both the Town Center Loan and Northpointe Loan, are not relevant to the determination as to whether the defendants' breach of § 4.01(i) was material.

breach exists so long as the breach defeats an essential purpose of the particular loans at issue. Although Virginia law is silent on this issue, courts elsewhere that have addressed the issue have sensibly concluded that the proper extent of materiality is whether the breach was material with respect to the specific loan at issue.[16] Indeed, as the First Circuit held in similar context, a requirement that a breach be material to the entire contract for the sale of numerous loans would be appropriate if the plaintiff were seeking to rescind the entire sale of the loan portfolio, but where, as here, a plaintiff seeks to compel defendant to repurchase specific loans within a loan portfolio, the materiality inquiry is limited in scope to the particular loans at issue. *Resolution Trust Corp. v. Key Fin. Serv., Inc.*, 280 F.3d 12, 17 (1st Cir. 2001).[17] This analysis is persuasive here, as the remedy set forth in § 7.08 of the LSA requires only a buy-back of the specific loans to which the breach relates. Accordingly, in the present case, defendant's misrepresentation that the Town Center Loan and Northpointe Loan were cross-collateralized constitutes a material breach "if it is a failure to do something that is so fundamental" to the sale of the Town Center Loan and Northpointe Loan "that the failure to perform that obligation defeats an essential purpose of the contract" with respect to those loans. *Parr*, 268 Va. at 467.

---

[16] *See Resolution Trust Corp. v. Key Financial Serv., Inc.*, 280 F.3d 12, 17 (1st Cir. 2001) (holding that the materiality inquiry was limited to the specific loans at issue rather than the entire contract for the sale of 355 loans); *LaSalle Bank Nat'l Assoc. v. Lehman Bros. Holdings, Inc.*, 237 F. Supp.2d 618, 627-29 (D. Md. 2002) (holding that the question whether a breach of warranty was material was limited to the specific loan and the specific warranty at issue where a plaintiff sought to invoke a contractual buy-back remedy with respect to one loan within a loan portfolio).

[17] Specifically, the First Circuit concluded that "[r]ather than attempting to unwind the transaction, [plaintiff] is merely asserting its rights under the Agreement, which provided that "[i]n the event of the material breach of any representation or warranty set forth in in Section[ ] '2.5' … [defendant] hereby agrees, upon demand, to repurchase any Mortgage note with respect to which there shall have been a material breach … ." *Id.* Accordingly, the First Circuit held that "[t]he appropriate question is whether the title deficiencies constituted a material breach of the representations and warranties contained in § 2.5(o), and not whether the representations made in § 2.5(o) were material to the Agreement as a whole." *Id.*

Importantly, defendant's misrepresentation that the Town Center Loan and Northpointe Loan were cross-collateralized would not constitute a material breach if the loan documents for each of those loans provide post-default rights that are essentially equivalent to the rights that cross-collateralization would afford plaintiff. Put differently, the breach is not material if the LSA employs a belt-and-suspenders approach that ensures that where, as here, the loans are not in fact cross-collateralized, plaintiff is entitled by other means to the functional equivalent of cross-collateralization. In this regard, defendant contends that although it failed to provide the belt—cross-collateralization—defendant did provide a perfectly good pair of suspenders, namely the Town Center Loan Agreement's cross-default provision and the Town Center Loan's Northpointe Stock Pledge. If these provisions, in tandem, provide the same post-default rights that cross-collateralization of the Town Center Loan and Northpointe Loan would have provided plaintiff, then defendant's breach is not material, as the failure to cross-collateralize the loans would not "defeat an essential purpose of the contract" with respect to the Town Center Loan and Northpointe Loan. *Parr*, 268 Va. 461, 467 (2004). Specifically, the purpose of cross-collateralizing the Town Center Loan and Northpointe Loan was to ensure that in the event of default with respect to one loan, plaintiff could reach at least some of the collateral that secures the other loan. Although cross-collateralization would have been an effective means to achieve this purpose directly—by explicitly securing both loans by the same collateral—other provisions in the Town Center Loan and Northpointe Loan could accomplish the same goal. Thus, in order to determine whether there is a material breach, it is necessary to make clear what post-default rights plaintiff has pursuant to the loan documents upon the occurrence of default of either loan and whether those rights, taken together, are functionally equivalent to cross-collateralization.

In the event of a default on the Northpointe Loan, the loan documents entitle plaintiff to exercise its rights with respect to the collateral securing the Northpointe Loan[18] and to demand that the Singhs personally repay the Northpointe Loan pursuant to the Singhs' Northpointe Loan guaranty.[19] In addition, the loan documents for the Town Center Loan include a cross-default provision, which provides that the "occurrence of an [e]vent of [d]efault under the Northpointe Loan" constitutes an event of default under the Town Center Loan. Town Center Loan Agreement, § 5.01(j). Defendant contends that the cross-default provision enables plaintiff to use the collateral securing the Town Center Loan to pay the Northpointe Loan obligation. Yet, as plaintiff correctly points out, defendant's contention is mistaken because a cross-default provision, by itself, provides the lender only with the right to demand payment of, and collect, each of the cross-defaulted loans; the loans must be collected independently and the proceeds realized from the collection of one loan cannot be utilized to pay the other loan.[20] Thus, the

---

[18] In particular, plaintiff can exercise its right under the Northpointe Deed of Trust to collect the rents generated by the Northpointe Property and apply them to the outstanding balance of the Northpointe Loan. Pl. Supp. Ex. 1, at 2, 17-18; Pl. Supp. Ex. 2, at 2-3. Plaintiff can also initiate foreclosure proceedings against the Northpointe Property, sell the Northpointe Property at a public auction and supply the proceeds from that public auction to the outstanding balance of the Northpointe Loan. Pl. Supp. Ex. 1, at 2, 17-18.

[19] As noted already, because the Singhs' guaranty is unsecured, plaintiff cannot seek satisfaction of the Northpointe Loan from any of the Singhs' assets unless and until plaintiff sues the Singhs, obtains a final judgment against them for the sums outstanding on the Northpointe Loan, and executes on that judgment.

[20] *See Agrippa, LLC v. Bank of America, N.A.*, No. 10 Civ. 9478(PAC), 2011 WL 102677, at *4 (S.D. N.Y. January 11, 2011) (recognizing that proceeds realized from the foreclosure of a property securing one loan that was cross-defaulted, but not cross-collateralized, with a second loan could only be utilized to pay the first loan and noting that the plaintiff's suggestion that the lender could use the proceeds to satisfy the second loan "confuses or conflates cross-collateralization with cross-default"); *Behrens v. Wedmore*, 698 N.W.2d 555, 563 (S.D. 2005) (noting that a secured creditor was unable to utilize collateral securing one loan to satisfy another loan in spite of a cross-default provision because the two loans were not cross-collateralized).

cross-default provision, by itself, does not provide a means of accomplishing indirectly what cross-collateralization would accomplish directly.

In the event of a default on the Town Center Loan, the loan documents entitle plaintiff to exercise its rights with respect to the collateral securing the Town Center Loan[21] and to demand that the Singhs personally repay the Town Center Loan pursuant to the Singhs' Town Center Loan guaranty. Pursuant to the Northpointe Stock Pledge, Mr. Singh's Northpointe stock is among the collateral securing the Town Center loan. Accordingly, plaintiff can exercise its right under the Northpointe Stock Pledge to sell the Northpointe stock at a public or private sale and apply the net proceeds from that sale to the outstanding balance of the Town Center Loan. Pl. Ex. 7, at § 5(b). In addition, defendant contends that the Northpointe Stock Pledge allows plaintiff to sell the Northpointe Property and apply the net proceeds of that sale to the Town Center Loan, effectively providing plaintiff the same rights that would have been available if the Town Center Loan was cross-collateralized with the Northpointe Loan. Specifically, defendant contends that pursuant to the Northpointe Stock Pledge: (i) plaintiff can "elect to become the holder of record title to the [Northpointe stock]"; (ii) as the holder of record title, plaintiff "may exercise all voting rights and other rights as if it were the absolute owner of the [Northpointe stock]"; and therefore (iii) plaintiff can exercise its voting rights to direct Northpointe to sell the Northpointe Property and use the excess proceeds to pay the Town Center Loan. Def. Ex. 5, Northpointe Stock Pledge, at 7. Defendant contends that this result is functionally equivalent to cross-collateralization. As plaintiff correctly points out, however, the post-default rights described by

---

[21] As with the Northpointe Loan, plaintiff can exercise its right under the Town Center Deed of Trust to collect the rents generated by the Town Center Property and apply them to the outstanding balance of the Town Center Loan. *See* Pl. Supp. Ex. 4; Pl. Supp. Ex. 8. Plaintiff can also initiate foreclosure proceedings against the Town Center Property, sell the Town Center Property at a public auction and supply the proceeds from that public auction to the outstanding balance of the Town Center Loan. Pl. Supp. Ex. 4, at 2-3, 18-20.

defendant are not essentially equivalent to the post-default rights that cross-collateralization would afford plaintiff. This is so because even if plaintiff completed the sale of the Northpointe Property on the occurrence of a default on the Town Center Loan, as defendant suggests, any proceeds of that sale would first go to Northpointe's creditors, not to plaintiff by virtue of the Town Center Loan. In particular, the proceeds would be applied (i) to the Northpointe Loan, as the Northpointe Property secures that loan, and if any proceeds were left, (ii) to any debts that Northpointe owes subordinate creditors.[22] Importantly, since the Town Center Loan is not *secured* by the Northpointe Property, Northpointe's stockholder, plaintiff, would be entitled only to the residual proceeds, if any, that remained after the debts owed to all of Northpointe's creditors were satisfied, whereas, if the Northpointe Property in fact cross-collateralized the Town Center Loan and the Northpointe Loan, then plaintiff would be ahead of the other creditors in the liquidation of the Northpointe Property. Simply put, cross-collateralization would entitle plaintiff to a superior position in the creditors' pecking order. Thus, contrary to defendants' suggestion, the Northpointe Stock Pledge does not provide plaintiff with rights that are functionally equivalent to the rights that cross-collateralization would afford plaintiff.

In sum, defendant's misrepresentation that the Town Center Loan and Northpointe Loan were cross-collateralized constitutes a material breach because the cross-default provision and the Northpointe Stock Pledge do not provide plaintiff with post-default rights functionally equivalent to the rights that cross-collateralization would have afforded plaintiff. Accordingly, plaintiff is entitled to invoke the LSA's buy-back remedy to compel defendant to repurchase the

---

[22] Indeed, if plaintiff were to prefer the Town Center loan over the Northpointe Loan obligation and any other obligations to creditors, plaintiff may be liable for fraudulent behavior. *Cf. Mills v. Miller Harness Co., Inc.*, 229 Va. 155, 157 (1985) ("When an insolvent corporation prefers a creditor who is in complete control of the corporation's affairs over other creditors of the corporation, the preference is fraudulent *per se*.").

Town Center Loan and Northpointe Loan in accordance with the formula set forth in the LSA. *See* LSA § 7.08.

## IV.

Analysis next properly considers whether defendant materially breached the LSA by failing to administer and maintain the Town Center Loan "substantially in accordance" with "defendant's underwriting standards," as was represented in the LSA. LSA 4.01(e). Specifically, plaintiff contends that the defendant failed to comply with its own policy it when it failed to downgrade the Town Center Loan upon the Loan Officer's recommendation to do so. This argument fails because plaintiff mistakenly views the Loan Officer's recommendation as self-executing, rather than as defendant's policy makes clear, a recommendation that can be adopted or rejected at a quarterly loan review meeting.

Defendant's Risk Rating Policy sets forth a procedure for changing the risk rating on a particular loan. Loan Officers are responsible for monitoring the loans they manage and "assigning the appropriate risk rating" both "as part of the original credit approval process and as part of the ongoing assessment of credit quality." Pl. Ex. 34, Risk Rating Policy 34, at 37. When a Loan Officer has assigned a change to a risk rating, the proposed change "can be approved by the Loan Committee at any time followed by ratification by the Executive Loan Committee." *Id.* In other words, a Loan Officer can recommend a change to a particular loan's risk rating, but that recommendation must be approved by the "Loan Committee" and ratified by the "Executive Loan Committee" before the recommendation becomes effective. Defendant's policy does not define "Loan Committee" or "Executive Loan Committee," and it does not explain the process by which those committees approve or ratify new assignments of risk ratings. In practice,

defendant considers any proposed changes to risk assessments at its regularly quarterly loan review meetings. *See* Reichert Dep. 107:5-12, 112:3-6.

Here, it is undisputed that on November 27, 2013, Singh informed Thomas, the Loan Officer responsible for the Town Center Loan, that Town Center had lost SERCO as a tenant. Promptly thereafter, Thomas wrote a draft risk rating memorandum that recommended a downgrade of the Town Center Loan from "Pass" to "Watch" because the Town Center Loan's DSC ratio had dropped below 1.2. Thomas Dep. at 87:10-88:1; Draft Risk Rating Justification.[23] Reichert and other executives reviewed Thomas's recommendation and decided not to downgrade the Town Center Loan at that time. Reichert Dep. 34:10-21, 69:4-11, 81:4083:13, 88:21-89:8, 94:4-17. Instead, Reichert called Robinson, plaintiff's President and COO, and told him about the loss of SERCO and that it would negatively affect cash flow. Reichert Dep. 134:5-136:15.

Plaintiff contends that defendant's administration of the Town Center Loan between November 27, 2013, and the December 3, 2013 closing date violated defendant's underwriting standards because under defendant's Risk Rating Policy, the Town Center Loan should have been downgraded to "Watch" or a lower classification[24] and that Reichert and the other executives who reviewed Thomas's recommendation did not have the authority to reject the recommendation because, according to the Risk Rating Policy, "[L]oan [O]fficers are responsible for assigning a proper risk rating to each loan they manage." Pl. Ex. 34, Risk Rating Policy 34, at 41. Put differently, plaintiff contends that Thomas's recommendation to change the

---

[23] Thomas prepared this recommendation in accordance with Acacia's policy. Reichert Dep. 30:7-33:5.

[24] Under defendant's loan policy, a loan rated should be rated as "Watch" if the loan's cash flow is adequate to service the debt, although the coverage need only be "marginal" and potential alternative "payment sources" can be considered. Pl. Ex. 34, Risk Rating Policy, at 41.

risk assessment for the Town Center Loan was self-executing and did not require further approval to become a formal change. This argument fails because it ignores the portion of the Risk Assessment Policy that requires that a Loan Officer's assessment "be approved by the Loan Committee" and be "ratifi[ed] by the Executive Loan Committee." *Id.*[25]

Moreover, plaintiff has not adduced any competent record evidence sufficient to raise a genuine issue of material fact as to whether defendant administered the Town Center Loan "substantially in accordance" with its own policy. It is undisputed that defendant did not have a regularly-scheduled quarterly loan review meeting at which it would review Thomas's proposed risk-assessment change during the period between November 27, 2013 (when Thomas learned that Town Center had lost SERCO) and the December 3, 2013 closing date. Nonetheless, Reichert and other executives reviewed Thomas's recommendation and decided not to downgrade the Town Center Loan's risk rating at that time; this in no way precluded a review as a matter of course at the next quarterly Loan Committee meeting. Reichert Dep. at 34:16-34:21, 69:4-11, 81:4-83:13, 88:21-89:8, 98:4-17. In short, the undisputed facts demonstrate that plaintiff clearly followed the process set forth in its written policy as well as its standard process for evaluating changes in the risk ratings.

Plaintiff makes much of the fact that that Thomas assessed the Town Center Loan according to Acacia's policy, rather than defendant's policy. Yet, this in no way establishes a genuine issue of material fact as to whether defendant administered the Town Center Loan "substantially in accordance" with its own policy because defendant had determined that, as a

---

[25] Although the language of the Risk Rating Policy is clumsy, as it states that a Loan Officer's assessment "can be approved" rather than it *must* be approved, the only plausible reading of the provision is that "approval" by the Loan Committee formalizes the change in the risk rating. Risk Rating Policy 34, at 41. This is so because the term "approval" presupposes a recommendation that has *not yet* been approved, and hence has not yet been formalized.

matter of policy, defendant would use Acacia's loan rating system for all the loans in the portfolio because Acacia had originated the loans under that rating system and the Loan Officers for the loan portfolio loans were former employees of Acacia. Reichert Dep. 30:7-32:16. In other words, defendant had adopted Acacia's policy as its own with respect to risk assessments by Loan Officers. Once a Loan Officer had assessed the risk rating of a particular loan in accordance with Acacia's policy, that risk assessment would be translated to the risk classification set forth in defendant's Risk Rating Policy before any ultimate determination was made with respect to changing a risk rating. Importantly, plaintiff cites no competent record evidence to dispute that defendant adopted the Acacia policy as its own and that defendant would translate any assessments made according to that policy to its Risk Rating Policy.

In sum, defendant is entitled to summary judgment on plaintiff's claim that defendant breached § 4.01(e) of the LSA because plaintiff has adduced no competent record evidence sufficient to establish a genuine issue of material fact as to whether defendant failed to administer the Town Center Loan "substantially in accordance" with defendant's "underwriting standards."[26]

---

[26] In addition to plaintiff's claim related to the administration of the Town Center Loan, the Complaint alleges that defendant failed to administer the Northpointe Loan substantially in accordance with its underwriting standards. Compl. ¶ 45. Yet, plaintiff makes no argument that there is a genuine issue of material fact, and as defendant correctly notes, such an argument would be barred because plaintiff did not provide notice in the Certificate of Defect of an alleged breach of § 4.01(e) with respect to the Northpointe Loan. *See* Certificates of Defect. Thus, defendant is entitled to summary judgement on this claim as well.

## V.[27]

For the reasons stated here, plaintiff's motion for summary judgment must be granted, and defendant's motion for summary judgment must be granted in part and denied in part.

An appropriate Order will issue.

Alexandria, VA
January 29, 2016

_____
T. S. Ellis, III
United States District Judge

---

[27] The parties have also challenged expert opinions and testimony in this case. Specifically, plaintiff has moved to strike Expert Designation of Matthew E. Cheek, Esq. and to exclude Mathew E. Cheek, Esq. from Testifying as an Expert Witness, and defendant has filed an objection to the magistrate judge's denial of defendant's motion to strike four new opinions from the supplemental report of plaintiff's expert, R. Hugh Rial. These issues need not be reached here, however, as the parties motions for summary judgment are properly resolved without reliance on expert opinions or testimony. Accordingly, plaintiff's motion to strike and defendant's objection to the magistrate judge's ruling are appropriately denied as moot.